314

## HARDEE v. WASHINGTON LOAN & TRUST CO. et al.
### No. 6803.

United States Court of Appeals for the District of Columbia.

Decided May 17, 1937.

Huston Thompson, Herbert S. Ward, and Thos. H. Patterson, all of Washington, D. C., for appellant.

William H. Donovan and James A. Cobb, both of Washington, D. C., for appellee.

George P. Barse and James M. Kane, both of Washington, D. C., for amicus curiæ.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

MARTIN, Chief Justice.

This appeal is taken from a decree entered by the United States District Court for the District of Columbia, dismissing a bill of complaint filed by appellant, as receiver of the Federal American National Bank & Trust Company against Washington Loan & Trust Company and Minnie Dixon Young, for the recovery of money paid to them in alleged violation of the laws and regulations governing the bank holiday in March, 1933.

The appellee, Washington Loan & Trust Company, will be designated herein as Washington Loan, and the Federal-American National Bank & Trust Company will be designated as the Federal American Bank.

It appears that on March 3, 1933, Mrs. Young had on deposit with the Federal American Bank the sum of $3,604.64. At 10:30 o'clock a. m. on that day she withdrew the sum of $3,000 therefrom, accepting in payment a manager's check, commonly called a cashier's check, payable to her order for that amount. On the same day she deposited this check in the savings department of Washington Loan, and it was credited to the joint account of herself and her husband, Joseph E. Young.

The banks of the District of Columbia were closed on March 4, 1933, it being Inauguration Day and a holiday, and also on March 5, that being Sunday.

At 1 o'clock a. m. on Monday, March 6, 1933, the President of the United States declared a bank holiday embracing all banks in the Nation, including, of course, the

Federal American Bank and Washington Loan (12 U.S.C.A. § 95 note).

On March 9, 1933 the bank holiday was extended by a further Proclamation of the President (12 U.S.C.A. § 95 note), and on that day Congress enacted the so-called Emergency Banking Relief Act (48 Stat. 1), ratifying the President's Proclamation of March 6, as well as the regulations issued thereunder by the Secretary of the Treasury, and authorizing the President to issue further proclamations. 12 U.S.C.A. § 95b.

On March 10, 1933, the President issued an Executive Order No. 6073, 12 U. S.C.A. § 95 note, authorizing the Secretary of the Treasury to permit the resumption of banking business under regulations to be prescribed by him.

On March 13, 1933 the Washington Clearing House Association held a meeting at which it was agreed that the banks in the District of Columbia should exchange, pay, or clear credit instruments issued by them such as cashier's checks and certified checks. This meeting adjourned at 2:15 p. m. After the meeting of the Clearing House had been held, the manager's check issued by the Federal American Bank to Mrs. Young was presented by a runner of Washington Loan for payment at a branch of the Federal American Bank and was paid in cash by a teller, after he had obtained authority to do so from a superior officer of the bank.

About 9:15 p. m. March 13, 1933, the president of the Federal American Bank learned from the office of the Comptroller of the Currency that the bank had not been approved for reopening.

On the next day, to wit, March 14, 1933, the banks in the District of Columbia which were found by the Secretary of the Treasury to be in safe condition were licensed to resume normal banking operations. The Washington Loan received a license on that day, but the Federal American Bank did not receive such license. On the same day a conservator was appointed for the Federal American Bank by the Comptroller of the Currency, and afterwards, to wit, on October 31, 1933, the Comptroller of the Currency appointed the appellant as receiver of the bank.

On April 2, 1934, the Comptroller of the Currency and the plaintiff as receiver of the bank demanded the return of the $3,000 paid to the Washington Loan upon the manager's check, less 50 per cent. dividend thereon declared by the Conservator under the direction of the Comptroller. This demand was refused by the Washington Loan, and on October 11, 1934, a bill in equity was filed in this case in the lower court against the Washington Loan and Mrs. Young, seeking to recover the amount paid upon the manager's check, upon a claim that the payment was illegally made by the Federal American Bank during the bank holiday period. The court after full hearing of the case held against the plaintiff and dismissed the bill of complaint. Whereupon the present appeal was taken to this court.

We are of the opinion that the decision of the lower court is erroneous.

It appears that for some months prior to March 6, 1933, the general public throughout the country was losing confidence in the banks. The history of this period is well set out in 2 George Washington Law Review 365–367. Deposits in the banks had declined during this period and bank failures had increased in number each year extending from 1928 until March, 1933 (Annual Report of Comptroller of Currency for 1933, p. 661). Early in February, 1933, banking conditions in various states prompted the Governors and Legislatures thereof partially or totally to suspend the operations of banks within their states. A bank holiday was declared in Michigan on February 14 "for the equal safeguarding without preference of the rights of all depositors." Similar action followed within a short period when the Governor of Maryland as well as the Governors of other states declared similar holidays. These facts are within the judicial notice of the court. Atchison, T. & S. F. R. Co. v. U. S., 284 U.S. 248, 52 S. Ct. 146, 76 L.Ed. 273. On February 25, 1933, Congress enacted the so-called Couzens Resolution Feb. 25, 1933, 47 Stat. 907 (12 U.S.C.A. § 1 note), enabling National banks by and with the approval of the Comptroller of the Currency to impose restrictions on withdrawals in the same manner as state banks were permitted to do by state law. It had plainly become imperative for the President and the Congress to invoke measures for the protection of National banks and their depositors.

On March 6, 1933, as hereinbefore noted, the President issued a Proclamation (12 U.S.C.A. § 95 note) as authorized by section 5(b) of the Act of October 6, 1917

(40 Stat.L. 411, as amended [50 U.S.C.A. Appendix § 5(b)]) declaring a four-day bank holiday, reading in part as follows:

"Whereas there have been heavy and unwarranted withdrawals of gold and currency from our banking institutions for the purpose of hoarding; and

"Whereas continuous and increasingly extensive speculative activity abroad in foreign exchange has resulted in severe drains on the Nation's stocks of gold; and

"Whereas these conditions have created a national emergency; and

"Whereas it is in the best interests of all bank depositors that a period of respite be provided with a view to preventing further hoarding of coin, bullion or currency or speculation in foreign exchange and permitting the application of appropriate measures to protect the interests of our people; and

"Whereas it is provided in Section 5(b) of the Act of October 6, 1917, (40 Stat.L. 411) as amended, 'That the President may investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange and the export, hoarding, melting, or earmarkings of gold or silver coin or bullion or currency; * * *'

"Now, Therefore, I, Franklin D. Roosevelt, President of the United States of America, in view of such national emergency and by virtue of the authority vested in me by said Act and in order to prevent the export, hoarding, or earmarking of gold or silver coin or bullion or currency, do hereby proclaim, order, direct and declare that from Monday, the sixth day of March, to Thursday, the ninth day of March, Nineteen Hundred and Thirty Three, both dates inclusive, there shall be maintained and observed by all banking institutions and all branches thereof located in the United States of America, including the territories and insular possessions, a bank holiday, and that during said period all banking transactions shall be suspended. During such holiday, excepting as hereinafter provided, no such banking institution or branch shall pay out, export, earmark, or permit the withdrawal or transfer in any manner or by any device whatsoever, of any gold or silver coin or bullion or currency * * * or transact any other banking business whatsoever."

On March 9, 1933, the President sent a message to both Houses of Congress containing among others the following statements:

"On March 3 banking operations in the United States ceased. To review at this time the causes of this failure of our banking system is unnecessary. Suffice it to say that the Government has been compelled to step in for the protection of depositors and the business of the nation.

"Our first task is to reopen all sound banks. This is an essential preliminary to subsequent legislation directed against speculations with the funds of depositors and other violations of positions of trust.

"In order that the first objective—the opening of banks for the resumption of business—may be accomplished, I ask of the Congress the immediate enactment of legislation giving to the executive branch of the Government control over banks for the protection of depositors; authority forthwith to open such banks as have already been ascertained to be in sound condition and other such banks as rapidly as possible; and authority to reorganize and reopen such banks as may be found to require reorganization to put them on a sound basis."

On the same day, to wit, March 9, 1933, Congress enacted, as above recited, the so-called Emergency Banking Relief Act (48 Stat. 1) containing in part the following provisions:

"Section 1. The actions, regulations, rules, licenses, orders and proclamations heretofore or hereafter taken, promulgated, made, or issued by the President of the United States or the Secretary of the Treasury since March 4, 1933, pursuant to the authority conferred by subdivision (b) of section 5 of the Act of October 6, 1917, as amended, are hereby approved and confirmed.

"Section 2. Subdivision (b) of section 5 of the Act of October 6, 1917 (40 Stat. L. 411), as amended, is hereby amended to read as follows: '(b) During time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, transfers of credit between or payments by banking institutions as defined by the President, and export,

hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof.'" [12 U.S.C.A. §§ 95a, 95b]

On the same day, to wit, March 9, 1933, the provisions of the President's Proclamation of March 6, 1933, were continued in force and effect until further proclamation.

It is claimed by the appellees that the foregoing proclamations were designed solely to prevent the hoarding of gold or silver metal or coins and currency, and did not prohibit and were not intended to prohibit payments between banks of the character of the payment here in question; nor did they in terms or otherwise fix or attempt to fix the rights of creditors; also that the payment made in this case was not made after the commission by the bank of an act of insolvency or in contemplation of insolvency, and therefore was not void as an unlawful preference under R.S. §§ 5242, 5236 (12 U.S.C.A. §§ 91, 194); and also, that, assuming that the payment here made came within the character of payments prohibited by the President's Proclamation during the bank holiday, and that both banks knew or were chargeable with knowledge of such prohibition, that would not give plaintiff a right to recover in the absence of a showing that such payment at the time it was made created a void preference under the applicable statutes.

■ We cannot agree with these contentions of the defendants. It seems clear that the payment of the manager's check by the Federal American Bank comes within the prohibitions contained in the President's Proclamation. The payment was made at the time when, according to the Proclamation, all banking transactions were suspended, except such functions as might be permitted or authorized by the Secretary of the Treasury (which are not involved herein) and such banking institutions should not pay out deposits or transact any other banking business whatsoever. The bank holiday was designed to protect the rights and interests of depositors as well as the public, by preventing a dissipation of bank assets, and also preventing depositors or other creditors from securing preferences in the distribution of such assets.

The payment of the manager's check in this case was a banking transaction. The check was issued in consideration of a debt of the bank owing to the depositor. The depositor was Mrs. Young. If she had called personally upon the bank to obtain payment of the check, without the intervention of any other person, such payment would plainly have been prohibited by the provisions of the Proclamation. The present situation is not affected by reason of the fact that she had indorsed the check and delivered it to the Washington Loan for collection.

In any view of the transaction, it appears as a diminution of and a payment from the assets of the bank to a creditor the same as if the payment were made to a holder of an ordinary certificate of deposit or a depositor's check drawn upon his bank account. Such a payment would have been prohibited as has already been indicated.

This conclusion makes it unnecessary for us to determine whether the insolvency of the bank was known to its officers at the time of the payment, for in any event the payment was an infraction of the rule prescribed by the Presidential Proclamation.

It follows that it is also unnecessary for us to pass upon the competency of the testimony of the bank's president, concerning his knowledge or lack of knowledge of the solvency or insolvency of the bank at the time.

We cannot agree with the contention of the defendants that even if the payment in question was illegal, it was made under a mutual mistake of law of the two parties to it, such as would prevent a recovery of the amount from the payee; and consequently that the Receiver, as the successor in title of the Federal American Bank, cannot recover the amount from the defendants. In our opinion the effect of the President's Proclamation of March 6, 1933 was to close all of the banks, including the Federal American Bank, as for a conservatorship, and thus fix the rights of their depositors and other creditors at that time, subject to subsequent licensing. This was done for the purpose, in part, of preventing preferences as between the various creditors. The Proclamation had the effect of depriving the officers of the bank of authority to make such payments as the one in question. The present payment which was made in violation of the condition was without authority of law upon the part of the bank and its officers.

■ The receiver in the present case is acting as an officer representing not only

318

the bank and its stockholders but also the depositors and any other parties in interest. His right to recover in this case therefore cannot be defeated upon the theory of a mutual mistake of law by the parties to the original payment; otherwise the transaction would result in a preference secured by the defendants whereby their claim would be paid in full to the prejudice of the other creditors.

We do not find it necessary for us at this time to pass upon the relative rights and obligations of the respective defendants with regard to the fund in question.

The decree of the lower court dismissing plaintiff's bill of complaint is reversed and the cause is remanded for further proceedings not inconsistent herewith.

Reversed and remanded.