16

**MORAN v. COBB.**
No. 7462.

United States Court of Appeals for the
District of Columbia.

Decided Feb. 3, 1941.

Rehearing Denied March 19, 1941.

18

J. Bruce Kremer, Herbert M. Bingham, Bruce A. Low, and H. Donald Kistler, all of Washington, D. C., for appellant.

George D. Horning, Jr., and James A. Cobb, both of Washington, D. C., for appellee.

Before STEPHENS, MILLER and RUTLEDGE, Associate Justices.

MILLER, Associate Justice.

Appellant, Moran, was appointed by the Comptroller of the Currency, on March 17, 1936, as receiver of the Prudential Bank, hereinafter called Prudential. On April 30, 1936, the Comptroller made an assessment upon the stockholders, including appellee Cobb, for $100,000. Following demand upon appellee for $1,200 on account thereof, and his refusal to pay, appellant, on August 1, 1936, sued to enforce against him the statutory liability of stockholders. The District Court held that the action was barred by the statute of limitations, and this appeal is from the judgment which was entered in favor of appellee.

Appellee's liability, if any, is to be determined by provisions of the Arizona Constitution[1] and statutes, and the receiver's cause of action is subject to the Arizona statute of limitations.[2] Under the provisions of the Arizona statute an action to enforce the stockholders' statutory double liability must be brought within three years after the closing of the bank.[3] The only question of the case is: When did Prudential close, within the meaning of the Arizona statute? The District Court correctly held that it closed, within every fair intendment of the statute, more than three years before the commencement of suit on August 1, 1936.

On March 6, 1933, the date of the President's proclamation declaring a bank holiday,[4] Prudential (1) had been for several

STEPHENS, Associate Justice, dissenting.

————◆————

---

[1] Ariz.Const. Art. XIV, § 11: "The shareholders or stockholders of every banking or insurance corporation or association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such corporation or association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares of stock."

[2] Moran v. Harrison, 67 App.D.C. 237, 91 F.2d 310, 113 A.L.R. 505, certiorari denied, 302 U.S. 740, 58 S.Ct. 142, 82 L.Ed. 572.

[3] Ariz.Rev.Code (1928) c. VIII, § 227.

[4] No. 2039, 48 Stat. 1689, 12 U.S.C.A. § 95 note.

months, and has been ever since, without a banking house for the conduct of its business; (2) for several months prior to, and ever since that date, has engaged in none of the usual functions of a bank; (3) specifically, has received no deposits, paid no depositors, honored no withdrawals, made no loans, held no meetings of its board of directors or stockholders, paid no taxes to the State of Arizona, where it was incorporated; (4) several months prior to that date experienced such severe financial difficulties that it assigned all its assets to another bank, the Industrial Savings Bank of Washington, D. C., hereinafter referred to as Industrial, to secure a note in the amount of $270,731.23; in return for which Industrial assumed all liabilities of Prudential to its depositors and other creditors, except liabilities to stockholders. It is apparent from the situation then existing that for all practical purposes Prudential was *closed*. That it was closed beyond all hope of reopening is also apparent from the following facts: The book value of all assets was $376,161.15. Of these over $115,000 consisted of loans, discounts and overdrafts; and approximately $172,000 consisted of bonds and securities. Its banking house, and furniture and fixtures accounted for approximately $72,000 more. It had due from other banks less than $1,200, and cash on hand less than $9,000. The note which it gave to Industrial was for the exact amount of its liabilities to creditors and depositors. The country was then in the depths of depression and book values grossly exceeded any possible market price for such frozen assets. In fact, the probability that the assigned assets would be insufficient was so great that directors of Prudential gave their bond in the amount of $50,000 to Industrial; in which the frank statement appears that it was given "in order to induce the Industrial Savings Bank to assume the liabilities of the Prudential Bank * * *." The assignment contract gave power to Industrial (1) to collect and liquidate the assets; (2) to compromise for less than face value; (3) to foreclose any part thereof *at* public or *private sale without notice* to Prudential; (4) to reimburse itself for all liabilities assumed, for interest thereon and for expenses. In addition the agreement provided not only for the bond above mentioned, but also stipulated that the personal liability of the stockholders for all debts and obligations, including the note for $270,731.23, should continue. Upon the transfer of assets, all books and records of Prudential were transferred to the banking house of Industrial. After the bank holiday in March, 1933, Prudential made no application for a license to reopen, received no license, and did not reopen. It never received back any of the assets, never again occupied a banking house, or functioned in any manner as a banking business of any character. It is apparent, also, from other facts, that no continuation of Prudential as a going concern was ever contemplated and no reopening ever hoped for. After September 26, 1932, Industrial, and subsequently its receiver, exercised dominion and control over all the assets of Prudential which had been delivered to Industrial; brought suit in his own name thereupon, made sales thereof and otherwise treated said assets as his own, commingling the same with the assets of Industrial, maintaining only a bookkeeping account entitled "Prudential Liquidation Account." Thereafter another institution, known as Industrial Bank of Washington, was formed and in connection therewith depositors in Industrial, including former Prudential depositors, were indiscriminately paid from said assets a dividend of thirty-five per cent. In June, 1933, the premises formerly occupied by Prudential as a banking house were sold.

A well-recognized principle of statutory interpretation is that, in the absence of some dominant reason to the contrary, a word used in a statute should be given its ordinary and commonly accepted meaning.[5] An examination of the authorities leads to the conclusion that the word closing, as applied to banks, is not one which has been given a limited or special meaning either by statute or by decision. Certainly, when we look to common parlance and understanding the word has a well known meaning. Apart from such difficulties as arise in the application of the pertinent statute, it would not be doubted that a bank which had gone through the experiences of Prudential was closed. Any other conclusion would seem absurd. An equally recognized principle of interpreta-

---

5 United States v. Wurts, 303 U.S. 414, 417, 58 S.Ct. 637, 82 L.Ed. 932; Old Colony Trust Co. v. Commissioner of Internal Revenue, 301 U.S. 379, 383, 57 S. Ct. 813, 81 L.Ed. 1169; De Ganay v. Lederer, 250 U.S. 376, 381, 39 S.Ct. 524, 63 L.Ed. 1042.

tion is that a statute should be so read as to avoid an absurd result.[6]

These principles of statutory construction are particularly pertinent in the present case because laws imposing double liability on stockholders of a bank are in derogation of the common law and cannot be extended beyond the words used.[7] For this reason we refused to read into the federal statute, which establishes double liability on stockholders of national banks, double liability on stockholders of state banks doing business in the District of Columbia, even though we held that the District statute[8] incorporates all the national bank acts which have to do with the machinery of administration in the case of insolvent banks; gives to the Comptroller the same control and management of an insolvent bank operating in the District as in the case of national banks; and likewise includes all provisions for the collection of debts, the distribution of assets and the enforcement of liability of stockholders.[9]

A minority view is expressed that there can be no closing of a bank within the meaning of the Arizona statute until an involuntary closing takes place, and that no involuntary closing took place in the present case until the Comptroller determined, on March 17, 1936, that Prudential was insolvent. For a number of reasons we think a contrary conclusion is required.

In the first place the minority view seems clearly contrary to the last sentence of the applicable statute, i. e., Section 227, which section reads as follows: "§ 227. Stockholders' liability. The stockholders of every bank shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements, of such corporation or association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares or stock. *In case of the dissolution or liquidation* of any bank, the constitutional and statutory liability of the stockholders *must* be enforced for the benefit of the creditors of such bank *by the superintendent of banks or by any receiver. The action* to enforce such liability shall be commenced within three years after *the closing* of such bank, and *may* be commenced *immediately upon the closing of the bank if in the judgment of the superintendent or receiver* the assets of such bank are insufficient to meet its liabilities." [Italics supplied]

In providing that the action to enforce the liability "may be commenced immediately upon the closing of the bank if in the judgment of the superintendent or receiver the assets of such bank are insufficient to meet its liabilities," the section clearly contemplates two things: (1) that a finding of insolvency by the superintendent or receiver is essential to existence of a cause of action against the stockholders;[10] (2) that the closing from which the three-year limitation period begins to run may occur before that finding is made. The statute clearly contemplates that the superintendent or a receiver may be in charge of the affairs of a bank which has closed before he makes or, possibly, before he can make any finding of insolvency. Closing therefore may be antecedent to such finding and may occur while the bank is entirely solvent.

Second, there is nothing in the Arizona statute to suggest that it was intended to give such special significance to the word *closing*; that, under the facts of the present case, it must be limited in its meaning to an involuntary taking over by a receiver appointed by the Comptroller. This court held in Washington Loan & Trust Co. v. Allman[11], that the words *by any receiver*, used in Section 227 of the

---

[6] Red River Broadcasting Co., Inc. v. Federal Communications Commission, 69 App.D.C. 1, 6, 98 F.2d 282, 287, certiorari denied 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400, and cases there cited.

[7] Brunswick Terminal Co. v. National Bank, 192 U.S. 386, 24 S.Ct. 314, 48 L. Ed. 491; Hamilton v. Offutt, 64 App.D.C. 385, 388, 78 F.2d 735, 738, certiorari denied 296 U.S. 592, 56 S.Ct. 121, 80 L. Ed. 419; Long v. Schutz, 26 Ariz. 432, 226 P. 529.

[8] D.C.Code (1929) tit. 5, § 298.

[9] Hamilton v. Offutt, 64 App.D.C. 385, 388, 78 F.2d 735, 738, certiorari denied,

296 U.S. 592, 56 S.Ct. 121, 80 L.Ed. 419.

[10] Button v. O. S. Stapley Co., 40 Ariz. 79, 9 P.2d 1010.

[11] 63 App.D.C. 116, 118, 70 F.2d 282, 284, certiorari denied, 292 U.S. 649, 54 S.Ct. 859, 78 L.Ed. 1499: "The liability here imposed by the Constitution of Arizona, and included in the articles of incorporation, created a contract on the part of the shareholders which followed them wherever they might go, and, in the event of the bank's insolvency, made them liable to respond at the instance of a receiver lawfully appointed at the place

Arizona Code, are broad enough in their meaning to include a receiver so appointed; but it did not hold, and the conclusion does not follow, that the words are not broad enough to include, also, receivers appointed by courts;[12] upon voluntary application by stockholders and officers;[13] and even for causes other than insolvency.[14]

■ Although, as the dissenting opinion points out, there is no provision in Chapter 8 of the Arizona statutes for voluntary dissolution of a solvent banking corporation as such, it does not follow that dissolution of a solvent banking corporation can be accomplished only by involuntary process. It can be accomplished under other provisions of the Arizona Code relating specifically to voluntary dissolution of *any* corporation.[15] No doubt a state banking corporation can wind up its affairs and go out of existence, also, upon the expiration of its charter;[16] or by reorganization as a national bank.[17] Similarly, a closely held banking corporation might go out of exist-

---

where the business was done, as completely and as fully as if the appointment had been made in Arizona. See Thomas v. Matthiessen, 232 U.S. 221, 34 S.Ct. 312, 58 L.Ed. 577."

[12] Grout v. First Nat. Bank, 48 Colo. 557, 562–563, 111 P. 556, 558, 559, 21 Ann.Cas. 418; King v. Pomeroy, 8 Cir., 121 F. 287; Leidigh-Dalton Lumber Co. v. Houck, 138 La. 159, 70 So. 72; Chicago Title & Trust Co. v. Central Trust Co., 312 Ill. 396, 144 N.E. 165.

[13] Bergh v. Security Sav. Bank, 122 Wis. 514, 100 N.W. 831; In re Marathon Sav. Bank v. Marathon Sav. Bank, 198 Iowa 692, 693, 694, 196 N.W. 729, 730, 200 N.W. 199: "Preliminary to the disposition of the first point on this appeal, it may be stated that on the 22d day of April, 1921, W. W. Bennett, cashier of the Marathon Savings Bank, E. B. Wells, its president, A. L. Whitney, its attorney, and one or two other persons, prepared and signed a petition in equity for the appointment of a receiver for the bank. This action was entitled, 'W. W. Bennett v. Marathon Savings Bank of Marathon, a corporation.' Due and timely notice of the hearing was given, and subsequently A. L. Whitney was duly appointed as receiver and qualified. Whatever power he has exercised or claimed is by virtue of his appointment in the receivership proceedings predicated on chapter 12 of title 18 of the Code. No party to this action can now be heard to question his standing as such receiver or the jurisdiction of the court in appointment of him. Section 1877 of the Code, in force and effect at the time of the appointment of the instant receiver, is a permissive statute, and provided that the auditor of state may, with the assent of the Attorney General, apply to the courts for the appointment of a receiver of a bank. It therefore results that the status or acts of the receiver in this case cannot now be impeached." Grout v. First Nat. Bank, 48 Colo. 557, 111 P. 556, 21 Ann.Cas./ 418.

[14] Kibble v. Morris, 101 Mont. 308, 314,

53 P.2d 1150, 1152, citing 12 U.S.C.A. §§ 93, 191, 192.

[15] Ariz.Rev.Code (1928) § 592: "Voluntary dissolution. Any corporation having discharged its obligations may be dissolved by a majority vote of the outstanding shares of stock. At least thirty days' notice in writing of such proposed dissolution shall be given the stockholders of such corporation. The resolution of dissolution shall state that the corporation has no outstanding indebtedness, that the prescribed notice for the meeting was given, and that a majority of the outstanding shares of stock have voted in favor of dissolution, or consented in writing thereto. Upon the filing of a copy of such resolution, certified by the president and the secretary, in the office of the corporation commission the corporation shall cease to exist, except as to creditors."

[16] Ariz.Rev.Code (1928) § 590: "Term of existence; renewal. Corporations may be formed to endure for twenty-five years, but may be renewed from time to time, for a period of not exceeding twenty-five years, when three-fourths of the votes cast at any stockholders' meeting, duly called and held for that purpose, shall be in favor of such renewal."

§ 594: "May wind up business. Corporations whose charters have expired, or which have been dissolved by the voluntary act of the stockholders, may continue to act for the purpose of winding up their affairs."

[17] Ariz.Rev.Code (1928) § 257: "Changing state bank to national bank. Any bank organized under this chapter may reorganize under the laws of the United States as a national bank. As soon as such bank has obtained the certificate from the comptroller of the currency authorizing it to commence business under the United States banking law, such reorganized bank shall take and hold all of the assets, real and personal, of such bank, subject to all liabilities existing against such bank organized under this chapter at the date of such reorganization, and shall immediately notify the su-

ence following defalcations by its officers —conniving with an unfaithful bank superintendent who failed to perform his duties under the statute[18]—without a formal involuntary taking over under Section 227.

Third, the statute of limitations is a statute of repose[19] and it seems fair to assume that the Arizona legislature had in mind the repose of possible actions involving stockholders of voluntarily closed banks as well as of those closed involuntarily. It was apparently in recognition of these guiding principles, concerning the double liability statute and the statute of limitations, that the Arizona legislature chose with deliberation the words *closing of the bank,* used in Section 227, to designate the commencement of the statutory period. Here was an event of common knowledge, which could be expected to arrest the attention of all interested persons, and put them on inquiry as to their rights and liabilities. The effect of the minority view would be that when banks close voluntarily, there can be no closing; hence the stockholders' double liability would be widely expanded beyond the words used in the statute; and the statute of limitations, far from being a statute of repose, would make possible actions against stockholders for unlimited periods after closed banks had actually passed from the memory of the communities in which they had been located. We cannot impute such an intention to the Arizona legislature.

Fourth, reading the word *closing,* in the light of certain recent Arizona cases, the definition proposed in the dissenting opinion would produce a highly anomalous result. In fact, according to the reasoning of those cases, Prudential was not only closed, it had ceased to be a bank. In State Tax Commission v. Yavapai County Sav. Bank,[20] the Arizona Supreme Court stated, as the essential element in the definition of a bank, that it must be "an institution which receives and pays out deposits"; and in that case refused to permit taxation—as a bank—of a business institution which failed to meet the test thus stated. It is significant that the Arizona Supreme Court reached the same result in another tax case in which a bank had ceased to be a going concern, because it had become insolvent and had been taken over by the bank superintendent for liquidation.[21]

We recognize that as a result of the interpretation which we have given to the Arizona statute, the period actually available for filing suit in a particular case may be less than three years; that in one case the period may be less than in another, depending upon the time which elapses between closing and determination of insolvency; in fact that if the determination of insolvency—administrative or judicial—is not made until more than three years after the closing, the provision in the last sentence of Section 227 may operate to bar enforcement of the double liability altogether. However, if insolvency occurs, or reasonably appears to do so, within the three-year period, the statute may well be regarded as a means of securing diligence in making the determination which is essential for institution of suit. It is a prod on the superintendent or receiver to exercise his judgment promptly when insolvency, or a reasonable basis for believing that it may exist, oc-

---

perintendent of such reorganization and transfer."

[18] See Ariz.Rev.Code (1928) § 261.

[19] Guaranty Trust Co. v. United States, 304 U.S. 126, 136, 58 S.Ct. 785, 790, 82 L.Ed. 1224: "The statute of limitations is a statute of repose, designed to protect the citizens from stale and vexatious claims, and to make an end to the possibility of litigation after the lapse of a reasonable time. It has long been regarded by this Court and by the courts of New York as a meritorious defense, in itself serving a public interest." Bell v. Morrison, 1 Pet. 351, 360, 7 L.Ed. 174; Strong v. Andros, 34 App.D.C. 278, 283, 19 Ann. Cas. 101; Arizona Eastern R. Co. v. Old Dominion Copper Min. & Smelting Co., 14 Ariz. 209, 213, 127 P. 713, 715.

[20] 52 Ariz. 374, 384, 81 P.2d 86, 90:

"What then is the test of a banking business?

"[Here are set out a number of quotations from various authorities.] These definitions differ in their terms, but it will be found that there is at least one element appearing in each and every one of them—a bank is an institution which receives and pays out deposits. Indeed, paragraph 4850, R.S.A. (Civil Code) 1913, apparently recognizes this as an essential part of the banking business, for it says: ' * * * And all shares of stock of every bank, and banking company, corporation, and association, wheresoever and howsoever organized, engaged in the business of receiving deposits and of buying or selling exchange * * *.' "

[21] Federal Land Bank v. Yuma County, 42 Ariz. 45, 22 P.2d 405.

curs and not to keep the stockholders on tenterhooks indefinitely by postponing decision in the hope that something may happen to bring the bank back into a condition of clear solvency. At the same time the statute brings similar pressure upon the creditors, either to secure action within the period, from the superintendent or receiver, or to take other steps to have the necessary determination made. This would not seem to be beyond legislative power, when insolvency occurs within the period and the cause of action is lost merely because those charged with enforcing it and those whose interests are at stake neglect to take the steps essential to make the foundation for the case within the prescribed time. That is but the usual purpose and effect of statutes of repose. Moreover, negligence or delay upon the part of the superintendent in taking over the bank's affairs or upon the part of creditors in procuring appointment of a receiver would be as fatal to the statute's policy of repose for stockholders, after a reasonable opportunity for action in the creditors' interest, as would similar delay by the superintendent or a receiver in making the administrative finding of insolvency necessary for beginning suit. Both are essential steps preliminary to actual enforcement of the liability and the policy of the statute may well be to force prompt action in taking them, if it can be had. Nor can such a requirement be said to nullify the liability specified in the constitution, if upon the facts it is reasonably possible for both these steps to be taken within the prescribed period.

▮ If, however, the bank does not become insolvent or there is no reasonable basis for such a judgment, administrative or judicial, within three years from closing, application of the bar nullifies the cause of action and does so without any reference to neglect or delay by the superintendent, receiver or creditors. This constitutes the most serious apparent objection to interpreting the statute as specifying some date antecedent to a determination of insolvency. Whether that position might be sustained upon the view that such a case would be unlikely to occur and therefore abnormal, and that it is better to fix an easily ascertainable date for starting the period in the normal case than to preserve the cause of action for the abnormal one, might present a serious question of constitutionality under the Arizona law. But even if the provision should be held unconstitutional in such an application, it would not follow that it would be so in the others which have been mentioned, and if the present case can be brought within any of them, the provision should be applied according to its terms.

The statute was drawn primarily with the idea that enforcement would occur in Arizona. The occurrence in Arizona of such a cessation of business as took place in the present case, because the bank was experiencing "serious financial difficulties," would call for intervention by the superintendent of banks under his statutory duty, or for appointment of a receiver.[22] The statute no doubt contemplated that in such a situation the superintendent would not disregard his duty and that the creditors would not sleep on their rights. On the facts presented by the record, if Prudential had been doing business in Arizona and had closed there as it did here, with delay in taking over of the bank's affairs by the superintendent, or in appointment of a receiver similar to that which characterized the Comptroller's action in this instance,

---

[22] Ariz.Rev.Code (1928) c. VIII, § 245, provides that for causes specified the superintendent of banks "may forthwith take possession of the property and business of such bank and retain such possession until such bank shall resume business, or its affairs be finally liquidated as herein provided." Among the causes are impairment of capital, and a showing by examination or reports such that the superintendent should "have reason to conclude that such bank is in an unsound or unsafe condition to transact business, or that it is unsafe and inexpedient for it to continue business, * *." The statute also lists several other causes which may occur entirely without reference to insolvency, namely, that the bank has violated its articles of incorporation or the law; is conducting its business in an unauthorized manner; refuses to submit its books and records to inspection of an examiner; or that any officer thereof refuses to be examined on oath concerning the bank's affairs. § 244 authorizes the superintendent to bring an action for dissolution of the corporation for similar reasons. § 246 provides that on taking charge of the bank's affairs, as provided in § 245, the superintendent shall be vested with sole and exclusive ownership and title of all its assets; shall have power to conserve the assets and business; and "shall liquidate the affairs thereof as hereinafter provided."

the case would have been one appropriate for applying the bar in such a manner that the period began. to run on September 26, 1932, or, in any event, not later than March 6, 1933. The circumstances of the closing on September 26, 1932, were such that if they had occurred in relation to a bank doing business in Arizona, prompt action should have been taken by the superintendent of banks to take over the management of its affairs. In default of his doing so, the depositors and other creditors should have moved for the appointment of a receiver. The closing was a permanent cessation of business. It was for purposes of final liquidation. Although there was no insolvency if book values were taken at face value, the bank admittedly was experiencing financial difficulties and it is common knowledge that book values at that time more generally reflected an excess than a deficiency of actual ones. Not only was the situation one which would have called for prompt intervention by the superintendent or, lacking that, by creditors to secure a receiver's appointment, but as it developed within three years from September 26, 1932, or, in any event, from March 6, 1933, it afforded a reasonable basis for a finding of insolvency by one or the other of these officials. The findings show that both Industrial and its receiver commingled the assets received from Prudential with its own and treated them as such. If the contract authorized this, as it seemingly did, insolvency of Industrial was insolvency of Prudential. If it did not authorize it, the commingling was an act of misappropriation which made Prudential's insolvency almost a certainty, when considered in connection with its condition entirely apart from the commingling. Apart from the stockholders' liability, Prudential stood stripped of all resources after the transfer, a mere shell of a corporate entity. Standing as such, it clearly was insolvent from the time of the transfer in September, 1932. But if account is taken of the provision made for Prudential's creditors by the contract with Industrial, the case is little different, except possibly for the period between September 26, 1932, and March 6, 1933. Assuming that insolvency, or a reasonable basis for finding it, did not exist within that period, clearly such a basis existed from shortly after its end. Industrial was closed by the President's proclamation and did not reopen. Instead, a receiver was appointed, took charge of its affairs and proceeded to liquidate them. In doing so, he carried forward the liquidation of Prudential's business, commingling the assets and paying depositors of both banks indiscriminately from the commingled funds. In view of that fact, and the further fact that Prudential made no effort to procure a license to reopen, the conclusion is inevitable that reasonable grounds for an administrative finding of insolvency of Prudential existed within three years from September 26, 1932, certainly from March 6, 1933. That being true it would have been perfectly possible for the superintendent of banks, had all these things occurred in Arizona, to fulfill both the essential steps for creating and asserting the stockholders' liability prior to the expiration of three years from September 26, 1932, or March 6, 1933, namely, to take possession of Prudential's affairs and to make an administrative finding of insolvency. And in case of his failure to act, the creditors should and could have acted within the period to procure a receiver's appointment and a determination of insolvency. The cause of action thus could have been perfected and asserted within that period. The case, therefore, is not one in which the constitutional liability would be nullified, without reference to neglect or delay on the part of those whose business it was to act.

Neither is a different result required because the facts occurred in the District of Columbia; for while the stockholders' liability may be enforced in the District by a receiver appointed by the Comptroller,[23] both the existence and the duration of the liability must be determined by the law of the state of incorporation.[24] Consequently the Comptroller is governed

---

[23] Act of June 30, 1876, 19 Stat. 63, 12 U.S.C.A. § 191; D.C.Code (1929) tit. 5, § 298; Washington Loan & Trust Co. v. Allman, 63 App.D.C. 116, 70 F.2d 282, certiorari denied 292 U.S. 649, 54 S.Ct. 859, 78 L.Ed. 1499. Cf. Harper v. Moran, 64 App.D.C. 210, 76 F.2d 980, certiorari denied 296 U.S. 592, 56 S.Ct. 104, 80 L.Ed. 419; Moran v. Harrison, 67 App.

D.C. 237, 91 F.2d 310, 113 A.L.R. 505, certiorari denied 302 U.S. 740, 58 S.Ct. 142, 82 L.Ed. 572.

[24] Ibid. Cf. Hamilton v. Bergling, 66 App.D.C. 83, 85 F.2d 249; Hamilton v. Offutt, 64 App.D.C. 385, 78 F.2d 735, certiorari denied 296 U.S. 592, 56 S.Ct. 121, 80 L.Ed. 419.

by the same limitations of time and conditions for enforcement as would apply to the Arizona superintendent of banks. Whether enforcement is had by action of the one or the other official, the policy of the statute is the same, namely, to secure promptness in perfecting as well as in suing upon the cause of action. In the circumstances presented here that policy was not observed. The Comptroller stood by for more than three years after the bank was closed before determining that an assessment was necessary and appointing a receiver to sue upon the liability. In doing so he followed the customarily applicable procedure under the national banking laws, but he neglected to take account of the fact that the Arizona statute requires the cause of action to be perfected as well as asserted within three years from the closing of the bank, when that can be done, and that under the Arizona statute closing is not identical with determination of insolvency. The error was one not hard to make, but it was, nevertheless, fatal. Since the facts disclose that a reasonable basis existed within three years of September 26, 1932, or in any event from March 6, 1933, both for taking over the bank's affairs and for finding insolvency by the superintendent of banks, had the case arisen in Arizona, a similar basis existed for action by the Comptroller in these respects within that time. In that period he could have perfected the cause of action and caused it to be asserted. His failure to do so, and the failure of Prudential's creditors to take steps to procure the appointment of a receiver within the time allowed, preclude enforcement of the liability afterward.

█ We need go no further than to say that, while a determination of insolvency remains an essential condition of suit, that condition, as well as the filing of suit, must be fulfilled within three years from the date the bank closes for liquida-

tion, if this can be done, as it could have been done here. So far, at least, the statute is valid. Whether it would be so in case the cause could not be perfected within the three-year period, and if not, what period of limitations might apply under the Arizona laws, are questions not presented by the facts of this case and better left for the consideration of the courts of Arizona when they arise.

Affirmed.

STEPHENS, Associate Justice (dissenting).

This is an action commenced in the District Court of the United States for the District of Columbia by the appellant Moran, as receiver of the Prudential Bank, against the appellee, Cobb, as a stockholder, to recover a sum alleged to be owing and unpaid upon a statutory stockholder's liability. The appeal questions the correctness of a judgment entered in favor of the appellee upon the ground that the statute of limitations had run against the action. The record in the case was prepared under Rule 76[1] of the Rules of Civil Procedure for the District Courts of the United States, and pursuant to that rule contains an agreed statement of facts. The record contains also findings of fact and conclusions of law made by the trial court and the judgment entered.

The agreed statement shows the following facts: The Prudential Bank, hereafter referred to as the Prudential, was incorporated in Arizona on November 4, 1920, to conduct a general commercial savings bank business in the District of Columbia and elsewhere. It established a banking house in the District during July, 1923, and there conducted a general banking business until September 26, 1932. On that date it was experiencing financial difficulties, and it entered into a liquidating agreement with the Industrial Savings

---

[1] Rule 76. Record on Appeal to a Circuit Court of Appeals; Agreed Statement. When the questions presented by an appeal to a circuit court of appeals can be determined without an examination of all the pleadings, evidence, and proceedings in the court below, the parties may prepare and sign a statement of the case showing how the questions arose and were decided in the district court and setting forth only so many of the facts averred and proved or sought to be proved as are essential to a decision of the questions by the appellate court. The state-

ment shall include a copy of the judgment appealed from, a copy of the notice of appeal with its filing date, and a concise statement of the points to be relied on by the appellant. If the statement conforms to the truth, it, together with such additions as the court may consider necessary fully to present the questions raised by the appeal, shall be approved by the district court and shall then be certified to the appellate court as the record on appeal. 28 U.S.C.A. following section 723c.

Bank of Washington, D. C., hereafter referred to as Industrial. That agreement had the following effect: The Industrial assumed all of the liabilities of the Prudential (except those to stockholders on account of capital stock, surplus and profits). The Prudential executed in favor of the Industrial a corporate note payable six months after date in the sum of $270,-731.23—this figure representing the total of its liabilities. As security for this note the Prudential assigned to the Industrial all of its assets—of a book value of $376,161.-15. The directors of the Prudential executed a personal bond in favor of the Industrial in the principal sum of $50,000 as additional security for the note. The Industrial obliged itself to administer the assets of the Prudential, to collect and liquidate the same, and after it should have been reimbursed for all liabilities assumed, plus interest and expenses, to turn over any remaining assets to a liquidating agent of the Prudential for the benefit of the stockholders of the latter. The liability of the stockholders of the Prudential for its debts and obligations, including liability for the payment of the note referred to, was preserved.

After the execution of this agreement, the Prudential received no deposits, paid no depositors, made no loans, exercised none of the usual banking functions, paid no franchise taxes to the state of Arizona, held but one directors and stockholders meeting, and had no house for the conduct of a banking business in the District. The premises which it had occupied in the District were sold in June, 1933. The books and records of the Prudential were all transferred to the Industrial.

The Industrial proceeded with liquidation of the assets of the Prudential until March 6, 1933. On that date the Industrial closed pursuant to the proclamation of the President, 48 Stat. 1689, declaring a bank holiday; it did not reopen. Later a conservator, and thereafter a receiver, were appointed by the Comptroller of the Currency for the Industrial and these officers continued liquidation of the Prudential pursuant to the agreement. The Prudential did not apply for a license, and was not licensed, to reopen after the President's proclamation.[2] On March 17, 1936, the Comptroller determined the Prudential to be insolvent and appointed the appellant

Moran as its receiver. The appellant as receiver acquired no assets of the Prudential, all of the same having been transferred to the Industrial under the liquidating agreement. The appellant as receiver advertised for creditors of the Prudential to present their claims and depositors presented claims aggregating approximately $4300, and the receiver of the Industrial presented claims approximating $100,000. On the date of the determination of insolvency, March 17, 1936, the appellee owned and held sixty shares of the capital stock of the Prudential. On April 30, 1936, the Comptroller made an assessment and requisition upon the stockholders of the Prudential, including the appellee, for $100,000 to be paid by an assessment of 100% of the par value ($20) of the shares. The appellant thereafter made demand upon the appellee for payment of the amount—$1200— equal to the par value of his shares, but this demand was refused.

The agreed statement on appeal further contained the following:

"At the time of the incorporation of said bank and thereafter the Constitution of the State of Arizona in Article XIV, Section 11 thereof provided:

" 'The shareholders or stockholders of every banking or insurance corporation or association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such corporation or association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares or stock.'

"The Arizona Constitution is silent as to a time limitation on the exercise of the right to demand and collect the constitutional stockholders' liability and the matter was left to general law and to such action as the legislature of such state might take with reference thereto. In the revision of the Arizona laws in 1928, effective July 1, 1929, a statute of limitations was enacted, being incorporated in Revised Statutes of Arizona, 1928, Chapter VIII, Paragraph 227, as follows:

" '227. STOCKHOLDERS' LIABILITY. The stockholders of every bank shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements, of such corporation or association, to the ex-

---

[2] This assumes that the Prudential was closed by the President's proclamation.

As will appear below this is one of the questions in the case.

tent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares or stock. In case of the dissolution or liquidation of any bank, the constitutional and statutory liability of the stockholders must be enforced for the benefit of the creditors of such bank by the superintendent of banks or by any receiver. The action to enforce such liability shall be commenced within three years after the closing of such bank, and may be commenced immediately upon the closing of the bank if in the judgment of the superintendent or receiver the assets of such bank are insufficient to meet its liabilities."

Except for certain additions not here material the findings of fact which appear in the record correctly reflect the agreed statement. They are contained within the findings of fact certain statements which appear also in the conclusions of law, and which are conclusions of law, and the very conclusions of law which are in issue on this appeal. These are the italicized portion of the following:[3]

"The Prudential Bank closed its business and banking house on September 26, 1932. Thereafter it did not continue to do a banking business *and, within the meaning and intent of the aforesaid Arizona statute, said bank was closed on September 26, 1932. . . ."* [Italics supplied]

*"The effect of the president's proclamation was to close all banks within the District of Columbia as for a conservatorship and thus to fix the rights of their depositors and other creditors at that time, subject to subsequent licensing. The Prudential Bank was, further within the intent and meaning of the aforesaid Paragraph 227 of Chapter VIII of the Revised Statutes of Arizona, closed as the result of the President's proclamation on March 6, 1933.* Thereafter it received no license to re-open and to re-engage in a general banking business within the District of Columbia." [Italics supplied]

The present suit was commenced against the appellee on August 1, 1936—thus more than three years after September 26, 1932, the date of the execution of the liquidating agreement, more than three years after March 6, 1933, the date of the President's proclamation of a bank holiday, but within three years after March 17, 1936, the date when the Comptroller determined that the

Prudential was insolvent and appointed a receiver for it.

According to the agreed statement: "The Receiver's cause of action is subject to the Arizona statute of limitations. Under the provisions of the Arizona statute an action to enforce the stockholders' statutory double liability must be brought within three (3) years after the closing of the bank." This is consistent with a ruling of this court to which I refer more specifically below.

In issue between the parties to the appeal are left the following questions:

I. Do the words "closing of the bank" in section 227, chapter 8 of the Revised Code of Arizona for 1928, requiring that the action to enforce a stockholder's liability shall be commenced "within three years after the closing of such bank" apply to the cessation of operations of the Prudential under the voluntary liquidating agreement of September 26, 1932, so that the statute commenced to run against the present action on that date? If the answer to that question is in the negative, then—

II. Did the proclamation of the President of March 6, 1933, have the effect to close the Prudential, and if the answer to this question is yes, do the words of the Arizona statute apply to such a closing so as to cause the statute to commence running on March 6, 1933? If the answer to either portion of question II is in the negative, then—

III. Do the words of the Arizona statute apply to the action of the Comptroller in taking possession of, declaring insolvent, and appointing a receiver for, the Prudential, on March 17, 1936, so that the statute of limitations commenced running then with the consequence that the present action, filed on August 1, 1936, was commenced within time?

The appellee contends that question I must be answered in the affirmative, but that if not, then both portions of question II must be so answered, and that therefore the present action must fail. The appellant contends that question I and the first part of question II must be answered in the negative, and question III in the affirmative, and that hence the present action is in time.

For an understanding of the problems presented in the case certain decisions by

---

[3] These conclusions of law are embraced within conclusions of law numbers 1 and 2 appearing on pages 12 and 13 of the record.

the Supreme Court of Arizona and by this court must be borne in mind. As appears from its terms set forth above, the Arizona constitution is silent in respect of any time limitation upon the exercise of the right to recover upon a stockholder's liability. However, the Supreme Court of Arizona in Cowden v. Williams, 1927, 32 Ariz. 407, 259 P. 670, 55 A.L.R. 1059, Dagg v. Hammons, 1928, 34 Ariz. 445, 272 P. 643, 72 A.L.R. 1237, and In re Bank of Winslow, 1930, 36 Ariz. 507, 287 P. 444, held that the stockholders' liability created by the constitution was a secondary liability, and therefore contingent upon a deficiency of corporate assets, and that not until a determination by a court of the existence of a deficiency did the liability arise and only then did the statute of limitations commence to run. Those cases were decided under a one-year statute (Subdivision 3, Par. 709, Rev.Stat.Anno.1913, Civil Code of Arizona) applicable to actions upon all liabilities created by statute. But in Button v. O. S. Stapley Co., 1932, 40 Ariz. 79, 9 P.2d 1010, the Supreme Court of Arizona modified this rule. It recognized, consistently with the three · cases just mentioned, that the liability of stockholders is secondary; but it held, contrary to those cases, that it was not necessary to have a judicial determination of insolvency before the liability could come into existence. It held that the only restriction, in this respect, was that no judgment should be entered against a stockholder until it had been ascertained by the court in the action against him that there was a deficiency against which to apply the liability. And in this case the Supreme Court of Arizona stated, in view of the statute of 1928, that an action to enforce a stockholder's liability must be brought within three years after the "closing of the bank." The court did not, however, define those words.

Section 298 of title 5 of the District of Columbia Code of 1929 (31 Stat. 1302, c. 854, § 713; 32 Stat. 534, c. 1329; 34 Stat. 458, c. 3533) provides:

"All . . . banking institutions, organized under authority of any act of Congress to do business in the District of Columbia, or organized by virtue of the laws of any of the States of this Union, and having an office or banking house located within the District . . . where deposits or savings are received, shall be, and are hereby, required to make to the Comptroller of the Currency and to publish all the reports which national banking associations are required to make and publish under the provisions of . . . the Revised Statutes of the United States . . .. *And the Comptroller shall have power, when in his opinion it is necessary, to take possession of any such bank or company, for the reasons and in the manner and to the same extent as are provided in the laws of the United States with respect to national banks: . . .*" [Italics supplied]

This statute and its application to banks organized under state laws but doing business in the District, has been before this court for consideration in five cases, all brought by receivers, appointed by the Comptroller, to recover a stockholder's liability; three of the cases involved banks incorporated in Arizona. These cases are: Washington Loan & Trust Co. v. Allman, 1934, 63 App.D.C. 116, 70 F.2d 282; Harper v. Moran, 1935, 64 App.D.C. 210, 76 F.2d 980; Hamilton v. Offutt, 1935, 64 App.D.C. 385, 78 F.2d 735; Hamilton v. Bergling, 1936, 66 App.D.C. 83, 85 F.2d 249; Moran v. Harrison, 1937, 67 App.D.C. 237, 91 F.2d 310, 113 A.L.R. 505. In Washington Loan & Trust Co. v. Allman we held that section 298 empowered the Comptroller to appoint a receiver in the District for an Arizona banking corporation and that such receiver had power, under the provision of section 227 of the Arizona statute providing the stockholders' liability must be enforced for the benefit of creditors by "the superintendent of banks or by *any receiver,*" to bring an action in the District against a stockholder. (Italics supplied) In Harper v. Moran we rejected the contention of a stockholder of an Arizona banking corporation that there was no obligation to pay until the precise amount of his liability under the laws of Arizona had been determined by a court of competent jurisdiction; we held that determination by the Comptroller of the necessity for an assessment was sufficient to give rise to the obligation, and that the decision of the Comptroller that an assessment was necessary is conclusive. In Hamilton v. Offutt we rejected the contention of the receiver for a Virginia corporation that the Federal statute imposing a double liability upon the stockholders of national banking associations[4] should be

---

[4] "The stockholders of every national banking association shall be held individually responsible for all contracts, debts, and engagements of such association, each

read into section 298, with the effect to give rise to a stockholders' liability notwithstanding the absence of such under Virginia law. The rationale of the case was that in the absence of a local statute creating a stockholders' liability, the law of the state of incorporation governed. In Hamilton v. Bergling we reiterated this principle in respect of a West Virginia corporation. In the last case decided in the District, Moran v. Harrison, the facts were as follows: On July 14, 1932, the Comptroller determined insolvency of and appointed a receiver for an Arizona banking corporation. The receiver took possession on July 22, 1932, and levied an assessment on October 18, 1932. He filed action to enforce a stockholder's liability on October 17, 1935, this upon the theory that the three-year District of Columbia "catch-all" statute (D.C.Code (1929) tit. 24, § 341, 31 Stat. 1389 (1901)) was applicable and also Federal decisions to the effect that statutes of limitations in respect of stockholders' liabilities commence to run from the date of the assessment by the Comptroller. Rankin v. Barton, 1905, 199 U.S. 228, 26 S.Ct. 29, 50 L.Ed. 163; McDonald v. Thompson, 1902, 184 U.S. 71, 22 S.Ct. 297, 46 L.Ed. 437. But we held that the action was commenced too late, that both the existence and the duration of a stockholders' liability are determined by the law of the state of incorporation, and that if it is thereby made a condition of the right of action that it shall expire after a certain period has elapsed, no action can be maintained anywhere after that period; therefore the Arizona statute was applicable and the action must have been brought within three years after the closing of the bank. But this case, like Button v. O. S. Stapley Co., did not define the phrase "closing of the bank."

## I.

Do the words "closing of the bank" in the Arizona statute of limitations apply to the cessation of operations of the Prudential under the liquidating agreement of September 26, 1932, so that the statute commenced to run against the present action on that date: I think the answer to this question is necessarily in the negative. The cessation of operations under the liquidating agreement was, so far as the record shows, wholly voluntary. Nothing in the record indicates that it was accomplished at the instance of creditors or of the superintendent of banks or of any receiver. The words "closing of the bank" in the Arizona statute, when read, as they must be, in the light of the whole of the statute of which they are a part, obviously apply to an involuntary closing. Section 227, in which these words occur, is a part of chapter 8, title "Banks and Banking," of the Revised Code of Arizona for 1928. This chapter defines commercial banks, savings banks and trust companies,[5] creates a state banking department and the office of a superintendent of banks,[6] authorizes the superintendent to appoint examiners,[7] requires the superintendent or an examiner periodically to visit and examine banks and to inquire into their resources, mode of management, the official action of their directors, their investments and disposition of funds, and as to whether or not they are violating any of the provisions of laws relating to banks;[8] in section 227 is then set forth the provision relating to stockholders' liability and the statute of limitations printed earlier in this opinion. Sections 244 and 245 provide:

" § 244. . . . If the capital of any bank shall be impaired, or if any bank shall refuse to submit its books, papers and concerns to the inspection of any examiner, or if any officer thereof shall refuse to be examined upon oath touching the concerns of such bank, or if such bank shall violate the provisions of its articles of incorporation, or any law of this state, or if such bank shall suspend payment of its obligations, or if such bank shall conduct its business in an unsafe or unauthorized manner, or if from any authorized examination or report the superintendent shall conclude that such bank is in an unsound or unsafe condition to transact the business for which it is organized, or that it is unsafe and inexpedient for it to continue business, an action to procure a judgment dissolving such corporation may be brought by the superintendent.

"§ 245. . . . Whenever it shall appear to the superintendent that a bank has violat-

to the amount of his stock therein, at the par value thereof in addition to the amount invested in such stock....." Act of June 3, 1864, Rev.Stat. § 5151, as amended by Act of December 23, 1913, 38 Stat. 273, 12 U.S.C.A. § 63.

[5] Section 209.

[6] Section 210.

[7] Section 211.

[8] Section 216.

ed the provisions of its articles of incorporation or any law of this state, or is conducting its business in an unsafe or unauthorized manner, or if the capital of any bank is impaired, or if any bank shall refuse to submit its books, papers and records to the inspection of any examiner, or if any officer thereof shall refuse to be examined upon oath touching the affairs of such bank, or if any bank shall suspend payment of its obligations, or if from an examination or report. provided for the superintendent shall have reason to conclude that such bank is in an unsound or unsafe condition to transact business, or that it is unsafe and inexpedient for it to continue business, the superintendent may forthwith take possession of the property and business of such bank and retain such possession until such bank shall resume business, or its affairs be finally liquidated as herein provided."

\* \* \*

Section 246 provides that upon taking charge of the property and business of such a bank as is referred to in section 245, the superintendent shall forthwith be vested with the sole, exclusive and unconditional ownership and title of all the property and assets of the bank, and then states:

"Upon taking possession of the property and business of any bank the superintendent may do such acts as are necessary to conserve its assets and business, and shall liquidate the affairs thereof as hereinafter provided. He shall collect all money and debts due and claims belonging to it, and for such purposes is authorized to bring and defend actions and other proceedings in this state and elsewhere; and upon the order of the superior court of the county in which it is doing business, may sell or compound all bad or doubtful debts, and on like order may sell its real and personal property on such terms, at public or private sale, as the court shall direct, and if necessary shall enforce in this state or elsewhere the liabilities of its stockholders."

The chapter further provides that when the affairs of a bank have come into the hands of a superintendent for liquidation, the relations between the court and the superintendent shall be the same as the relations between the court and a receiver under existing laws.[9] The chapter contains also detailed directions in respect of the manner in which the superintendent of

banks shall proceed to liquidate a bank.[10] There is no provision either in this chapter of the Arizona statutes or elsewhere therein for the voluntary dissolution of a solvent banking corporation as such. The dissolution of such a corporation must be accomplished under the provisions of the statute relating to corporations generally (Rev. Code (1928) c. 14, § 592).

The foregoing I think puts beyond doubt that the dissolution or liquidation of banking corporations contemplated by chapter 8, and therefore necessarily by the words "closing of the bank" in section 227, is involuntary in character.

## II.

Did the proclamation of the President of March 6, 1933, have the effect to close the Prudential: I think this question also must be answered in the negative—and it is therefore unnecessary to answer the further question whether the words of the Arizona statute apply to a closing of banks by Presidential proclamation. No authority is cited, and I know of none, to the effect that the President's proclamation operated to close banks which prior to the date of the proclamation—in this case since September 26, 1932—had not been in actual operation as banks. The purpose of the proclamation was to prevent the exporting, hoarding, or earmarking of gold or silver coin or bullion or currency, or speculation in foreign exchange. To that end it ordered that "all banking institutions and all branches thereof located in the United States of America . . ." should observe a bank holiday, and that during that period "all banking transactions shall be suspended." More specifically it said:

"During such holiday . . . no such banking institution or branch shall pay out, export, earmark, or permit the withdrawal or transfer in any manner or by any device whatsoever, of any gold or silver coin or bullion or currency or take any other action which might facilitate the hoarding thereof; nor shall any such banking institution or branch pay out deposits, make loans or discounts, deal in foreign exchange, transfer credits from the United States to any place abroad, or transact any other banking business whatsoever."

It would be a strained construction of the phrase "any other banking business" to say that it embraced liquidation. Moreover such a general phrase should, under

---

9 Section 247.

10 Sections 249–253 inclusive.

the familiar doctrine *ejusdem generis,* be construed to embrace such transactions as are described in the preceding enumeration. Of such transactions the Prudential was carrying on none, according to the agreed statement, during the period from September 26, 1932, until the date of the proclamation. I think it obvious that the Presidential proclamation did not operate to close the Prudential. It blows the bubble of logic to the bursting point to say that a proclamation closing the actual operation of banks closes a bank not actually operating.

### III.

Do the words of the Arizona statute apply to the action of the Comptroller in taking possession of, declaring insolvent, and appointing a receiver for, the Prudential on March 17, 1936, so that the statute of limitations commenced running then with the consequence that the present action, filed on August 1, 1936, was commenced within time: This question I answer in the affirmative. This was a closing, as a matter of law, of the bank which had already actually ceased operating, and it was an involuntary closing. Therefore it is aptly covered by the words "closing of the bank" in the Arizona statute of limitations, which as I have demonstrated under topic I above, apply to involuntary dissolution or liquidation only. That the power of the Comptroller to subject banks to involuntary liquidation extends to institutions which have commenced liquidation voluntarily is attested by O'Conner v. Watson, 5 Cir., 1936, 81 F.2d 833, and Liberty Nat. Bank v. McIntosh, 4 Cir., 1927, 16 F.2d 906.

The position I thus take is, I think, confirmed by the proposition that under the Arizona decisions reviewed above the statutory liability of stockholders is secondary only and hence cannot arise until there has been some action properly determining insolvency. Nothing in the agreed statement of facts indicates an insolvency of the Prudential until the action of the Comptroller of March 17, 1936. While according to the agreed statement the Prudential was in "financial difficulties" on September 26, 1932, that phrase does not necessarily mean insolvency. It is worthy of note also that if the words "closing of the bank" in the Arizona statute must be applied to voluntary cessation of operations, the result would be, in all instances in which insolvency developed more than three years thereafter, to defeat the purpose of the statute to establish an enforceable stockholders' liability.

### IV.

In respect of the arguments of the appellee. He urges that: (1) The words "closing of the bank" are clear, and therefore permit of no construction. (2) To the knowledge of the Comptroller, whose office prepared the liquidating agreement, the Prudential was insolvent September 26, 1932. The Comptroller could not by delay in the appointment of a receiver postpone beyond that date the commencement of the running of the statute. (3) The Prudential was insolvent on March 6, 1933, because it was at that time not able to conduct its business or meet its obligations as they matured in the ordinary course. (4) The stockholders of the Prudential were not parties to the liquidating agreement, and did not agree to waive the statute or extend the commencement of its running beyond September 26, 1932. (5) Section 298 of title 5, District of Columbia Code of 1929, authorizes the Comptroller to take possession only of banks "having an office or banking house located within the District of Columbia where deposits or savings are received." On March 17, 1936, the date when the Comptroller took possession of the Prudential, it did not have an office or banking house located in the District where deposits or savings were being received. (6) In Hardee v. Washington Loan & Trust Co., 1937, 67 App.D.C. 241, 91 F.2d 314, the Comptroller argued, and this court held, that the President's proclamation of March 6, 1933, closed all banks on that day, and fixed on that day the rights of creditors in respect of banks which did not reopen; that case controls the instant case.

I think these arguments without merit. (1) While the words "closing of the bank" have no patent ambiguity, they involve a latent ambiguity in that it can not be determined from these words read alone whether they cover a voluntary as well as an involuntary cessation of business. Therefore, they are subject to construction. (2) The appellee's second argument is based upon matter not in the record. Nothing in the agreed statement discloses that the Prudential was insolvent September 26, 1932, or that if it was the Comptroller so knew, or that the office of the Comptroller prepared the liquidating agreement. Also this argument begs the question: In saying that the Comptroller could not postpone the commencement of the

running of the statute beyond September 26, 1932, it assumes that to be the date when the statute commenced to run. (3) There is nothing in the record to support the assertion of insolvency on March 6, 1933. (4) This argument, like the second, assumes that the statute commenced to run on September 26, 1932. (5) The argument that the words of section 298 "having an office or banking house located in the District of Columbia where deposits or savings are received" do not apply because at the time the Comptroller took possession of the Prudential on March 17, 1936, it did not—because it had not operated since September 26, 1932—have an office or banking house located within the District where deposits or savings were being received, would, by insistence upon rigid literality of tense reduce the statute to absurdity. Under such a view, the Comptroller would, for example, be disabled to take possession of and liquidate a bank whose operations in the District had been terminated by fire, or whose directors, for the very purpose of avoiding receivership, had stopped banking transactions upon the eve of action by the Comptroller. The words of a statute are not to be given a refined and technical grammatical application when this would defeat the common sense purpose of the statute. See 2 Sutherland, Statutory Construction (2d ed., 1904) § 409. (6) Hardee v. Washington Loan & Trust Co., and the argument of the Comptroller therein, concerned the effect of the President's proclamation upon operating banks. The case is thus distinguishable.

### V.

The conclusion reached by the majority that on September 26, 1932, or at least within three years of that date or of March 6, 1933, the assets of Prudential were insufficient to meet its liabilities, and that the Comptroller could have so determined had he done his duty, is I think not supportable either as a matter of law or as a matter of fact on this record. The Comptroller determined Prudential to be insolvent on March 17, 1936, and on April 30, 1936, he made an assessment and requisition upon the stockholders for a deficiency. It is settled law that the determination of the insolvency of a national bank—and accordingly, under section 298 of title 5 of the District of Columbia Code of 1929 above referred to, of this bank—and of the necessity of an assessment against its shareholders and of the amount thereof is committed exclusively to the judgment and discretion of the Comptroller and is not subject to judicial review except for fraud or mistake. United States Savings Bank v. Morgenthau, 1936, 66 App.D.C. 234, 85 F.2d 811, and cases therein cited; Davis Trust Co. v. Hardee, 1936, 66 App.D.C. 168, 85 F.2d 571, 107 A.L.R. 1425; and see Cooper v. O'Connor, 1939, 70 App.D.C. 238, 105 F.2d 761, and Harper v. Moran, 1935, 64 App.D.C. 210, 76 F.2d 980. See also Kennedy v. Gibson, 1869, 8 Wall. 498, 19 L.Ed. 476; Miller v. Stock, 3 Cir., 1933, 65 F.2d 773, 90 A.L.R. 1061; Deweese v. Smith, 8 Cir., 1901, 106 F. 438, 66 L.R.A. 971, affirmed per curiam, 1902, 187 U.S. 637, 23 S.Ct. 845, 47 L.Ed. 344. In Kennedy v. Gibson the Court said:

"It is for the comptroller to decide when it is necessary to institute proceedings against the stockholders to enforce their personal liability, and whether the whole or a part, and if only a part, how much, shall be collected. These questions are referred to his judgment and discretion, and his determination is conclusive. The stockholders cannot controvert it. It is not to be questioned in the litigation that may ensue. He may make it at such time as he may deem proper, and upon such data as shall be satisfactory to him. . . ." [8 Wall. at 505, 19 L.Ed. at 478.]

In Deweese v. Smith the Comptroller of an insolvent national bank in Missouri had made a second assessment upon stockholders. They contended in defense that although the Comptroller had the power to make a second assessment in a proper case, he had not in that case because, as the defendant stockholders alleged, the moneys called by the second assessment were not necessary to pay any debts of the bank but were demanded solely to make good losses which the receiver had sustained in the administration of affairs of the bank as a result of an unauthorized investment of moneys of the bank in property in California. But the court held that not even under such a charge could the determination of the Comptroller be collaterally attacked. Disposing of the question, the court, speaking through Sanborn, Circuit Judge, said:

"But this question is not open to litigation in this case. Under the acts of Congress and the decisions of the courts to which reference has been made the comptroller of the currency constitutes a quasi judicial tribunal, to whose exclusive determination Congress has intrusted the de-

cision in the first instance of the questions, what proportion of the full liability of the shareholder of an insolvent bank it is necessary to collect to pay its debts, and when this amount shall be paid. His decisions of questions within his jurisdiction are, like the decisions of the land department and of other quasi judicial tribunals, impervious to collateral attack, and open to avoidance by the court only in a direct attack upon them on the grounds of clear error of law, fraud, or mistake. U. S. v. Knox, 102 U.S. 422, 425, 26 L.Ed. 216; U. S. v. Northern Pac. R. Co. [8 Cir.], 95 F. 864, 870, 37 C.C.A. 290, 296; Bogan v. [Edinburgh American Land] Mortgage Co. [8 Cir.], 63 F. 192, 195, 11 C.C.A. 128, 130, 27 U.S.App. 346, 350; U. S. v. Winona & St. P. R. Co., 67 F. 948, 959, 15 C.C.A. 96, 107, 32 U.S.App. 272, 289. There is no averment of any error of law or of any fraud in the action of the comptroller in this case. Nor does the answer contain allegations sufficient to warrant the consideration of the mistake of fact, which is suggested. One who would attack for mistake of fact the judgment of an officer to whose decision the legislative department of the government has committed the determination of a question must distinctly plead and clearly prove the evidence before such officer from which the mistake resulted, the particular mistake that he made, the way in which the mistake occurred, and the fact that, if the mistake had not been made, the decision would have been otherwise, before a court can enter upon the consideration of the main issue alleged to have been decided by the officer through mistake. U. S. v. Northern Pac. R. Co. [8 Cir.], 95 F. 864, 882, 37 C.C.A. 290, 308; U. S. v. Atherton, 102 U.S. 372, 374, 26 L.Ed. 213; U. S. v. Budd, 144 U.S. 154, 167, 168, 12 S.Ct. 575, 36 L.Ed. 384; U. S. v. Mackintosh, 56 U.S.App. 483, 490, 29 C.C.A. 176, 179, 85 F. 333, 336; U. S. v. Throckmorton, 98 U.S. 61, 66, 68, 25 L.Ed. 93; Marquez v. Frisbie, 101 U.S. 473, 476, 25 L.Ed. 800. There is nothing of this character in the answer in this case, and, even if it contained such allegations, they would not constitute a defense at law, but it would be necessary for the defendant to present them by a bill in equity praying for the proper relief. There is, therefore, nothing in the answer which would warrant a consideration of the correctness of the action of the comptroller of the currency in calling for this second assessment. The only question it presents

is whether or not the determination of that question was within his jurisdiction, and of that there can be no doubt. Whether it was necessary to collect this second assessment of 25 per cent. of the par value of the stock of these defendants for the sole purpose of supplying losses wrongfully made by the receiver in the administration of the affairs of the bank, or it was necessary to collect it to pay the debts of the bank, regardless of such deficiency, was a question clearly within the jurisdiction of the comptroller; a question which he must have decided adversely to the defendants when he determined to make this second assessment, and a question upon which his decision is conclusive against the collateral attack upon it which is made by the defendants in their answer. Latimer v. Bard (C.C.) 76 F. 536, 540; Kennedy v. Gibson, 8 Wall. 498, 505, 19 L.Ed. 476; [Germania Nat.] Bank v. Case, 99 U.S. 628, 634, 25 L.Ed. 448; [Germania Nat.] Bank v. Case, 131 U.S.Append. 144, 23 L.Ed. 961; Casey v. Galli, 94 U.S. 673, 681, 24 L.Ed. 168; [Columbia Nat.] Bank v. Mathews, 85 F. 934, 941, 29 C.C.A. 491, 497, 56 U.S.App. 636, 651; Aldrich v. Yates (C.C.) 95 F. 78, 80." [106 Fed. at 445, 446.]

The instant case does not constitute an independent attack by bill in equity for fraud or mistake upon the Comptroller's determination that Prudential became insolvent on March 17, 1936, and that on April 30, 1936, an assessment and requisition upon stockholders was necessary. This case is an action by the receiver to collect an assessment upon a stockholder and the defense is the statute of limitations. And even if we could, under the issues in this case, review the determination of the Comptroller, there is nothing in this record, in my opinion, which warrants upsetting his determination of the fact and the time of insolvency and of the necessity of and the amount of an assessment. The case is before us on an agreed statement of facts, and upon findings by the trial court. The statement of facts shows that at the time of the liquidation agreement of September 26, 1932, the assets of Prudential, at the values set forth in the agreement, largely exceeded its liabilities. There is nothing in the statement of facts to the effect that the values of the assets exceeded the market price thereof. The statement of facts contains no statement as to any insolvency except the insolvency determined by the Comptroller on March 17, 1936. The find-

ings of fact say nothing of insolvency except as it may be inferred from the finding that on April 30, 1936, the Comptroller made an assessment and requisition upon the stockholders. For all that the present record shows the assets of Prudential may have exceeded its liabilities not only on September 26, 1932, when the bank voluntarily closed, but also on March 6, 1933, when the President's proclamation effected a closing of Industrial, and also at all times subsequent thereto until March 17, 1936, when the Comptroller determined insolvency to exist. And there is nothing in the record to warrant the conclusion that the Comptroller negligently delayed taking possession of Prudential, or that he was in any manner unfaithful to his trust.

In United States Savings Bank v. Morgenthau we refused, against the assertion of the bank and its president that it had never been insolvent and that its assets ought to be restored to its stockholders, to review the Comptroller's appraisal of assets and determination of insolvency. In Davis Trust Co. v. Hardee we again refused to review the Comptroller's determination of insolvency of a national bank and his determination that an assessment was necessary to pay its debts, against the assertion of stockholders who sought to enjoin enforcement of the assessment on the ground that the sale of the quick assets of the bank had been below fair value. Thus in both cases stockholders who sought the benefit of a collateral attack upon the Comptroller's determination were denied it. But in the instant case the stockholder is, in effect, permitted to make a collateral attack, and in part as a result of this escapes the assessment. The present ruling is not only thus in contradiction of previous decisions of this court on the same subject, but also is contrary to the principle, recognized by this court in many cases, that where a duty requiring expert capacity has been delegated by the Congress to an administrative officer his determinations of fact will not be overthrown on review except where clearly erroneous. Consistency in judicial decision is not merely a demand of logic; it is an essential of equal justice.

Since it is not possible to determine from the words "closing of the bank" alone in section 227 of chapter 8 of the Revised Code of Arizona for 1928, to what kind of a cessation of banking activity they were intended to apply, the section is subject to a latent ambiguity; therefore it must be construed. But the construction put upon it by the majority to the effect that the statute of limitations may commence to run before a deficiency has arisen is I think in defiance not only of the well settled general rule that statutes of limitation commence to run only when the causes of action to which they are applicable arise, but also of the Arizona law itself. A statute should be viewed in terms of the whole legal pattern of which it is a part, including not only related constitutional and statutory provisions but also legislative history and judicial decisions. Before section 227 became law in Arizona the Supreme Court of that state had held, as I point out at the outset of this opinion, in Cowden v. Williams, Dagg v. Hammons and In re Bank of Winslow, that the stockholder's liability created by the Arizona constitution was a secondary liability, contingent upon a deficiency of assets to meet liabilities, and that not until determination by a court of the existence of a deficiency did the liability arise, and that only then did the then applicable one-year statute of limitations commence to run. After section 227 supplanted, so far as the liability of stockholders of a bank was concerned, the one-year statute, the Supreme Court of Arizona decided Button v. O. S. Stapley Co., also discussed above. While that case, as I point out, held, contrary to the three previous decisions, that it was not necessary to have a judicial determination of insolvency before a stockholder's liability could come into existence—holding that the only restriction, in this respect, was that no judgment should be entered against a stockholder until it had been ascertained by the court in the action against him that there was a deficiency against which to apply the liability—the case in no other way modified the other three cases. It left standing therefore the proposition that the liability of stockholders is secondary, and that the statute of limitations commences to run when the cause of action arises by virtue of the existence of a deficiency, even though it did not in terms define the words "closing of the bank."

The interpretation of section 227 is not aided by State Tax Commission v. Yavapai County Savings Bank, 1938, 52 Ariz. 374, 81 P.2d 86, or Federal Land Bank of Berkeley v. Yuma County, 1933, 42 Ariz. 45, 22 P.2d 405, the tax cases referred to in the majority opinion. Those cases do not construe section 227. And the interpretation of the section is not, I think, aid-

ed by such a consideration as the supposed concern of the Arizona legislature that the repose of stockholders might be disturbed by uncertainty as to the duration of their liability unless an easily determinable event, that is, the actual closing of their bank—whether insolvency had been determined or not—were designated as the time for the commencement of the running of the statute of limitations. Nothing in the history or context of section 227 indicates that the Arizona legislature was more concerned over the anxiety of stockholders to be informed of the beginning and end of a cause of action against them than it was with the anxiety of depositors as to whether they would be able to reimburse themselves out of the liability of stockholders if the assets of the bank should prove insufficient to pay their deposits. And if the Arizona legislature had been concerned with, and obliged to discriminate between, the comparative anxieties of stockholders and depositors, it seems reasonable to conclude that it would have intended to prefer the latter class of persons, who put their money in banks for safe keeping, to the former, who put it in bank stocks for investment, and would therefore have intended that the statute of limitations should not commence to run until there was a determination of insolvency, thus giving the depositors the benefit of a full three years within which suit might be brought by the receiver against the stockholders.

Finally, I think that the point of view which the majority take in this case will have unfortunate practical results. As a matter of public policy and of fairness to both creditors and stockholders it is desirable that banks in difficulties be so dealt with by the Comptroller as to pay the creditors in full if possible, and to do this without assessing the stockholders if this is also possible. To accomplish such results often takes time—time during which market conditions affecting the value of assets may fluctuate—time in which to find purchasers for slow assets. But, in the view of the majority, section 227, as now construed, will operate as a "prod" upon the Comptroller to make an early determination of insolvency and of the necessity of an assessment and a prompt commencement of action against stockholders, in order to avoid a possible loss of remedy against the latter. Thus to harry the Comptroller into his determinations will operate against attempts by him to work banks out of financial difficulties for the benefit of both creditors and stockholders.